IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
March 11, 2015 Session

## IN RE: NOAH J.

**Direct Appeal from the Juvenile Court for Shelby County**
**No. Z8480      Dan H. Michael, Special Judge**

---

**No. W2014-01778-COA-R3-JV – Filed March 23, 2015**

---

This appeal involves a dispute between unmarried parents regarding a parenting schedule for their young son. Following a hearing before a juvenile court magistrate, an order was entered providing that the parents would have joint custody, with the designation of primary residential parent alternating each year. Mother requested a rehearing before the juvenile court judge. Several months later, the matter was reheard before another magistrate, who was appointed by the juvenile court judge to hear the matter as substitute judge. The magistrate sitting as substitute judge entered an order naming Mother primary residential parent and limiting Father to only supervised visitation. Father was ordered to pay all of Mother's attorney's fees. Due to the lack of written findings, we vacate the final order and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Margaret A. Reid and Elizabeth W. Fyke, Memphis, Tennessee, for the appellant, William J.

Aubrey L. Brown, Jr., Memphis, Tennessee, for the appellee, Emily W.

### OPINION

### I. FACTS & PROCEDURAL HISTORY

Emily W. ("Mother") and William J. ("Father") began dating in June 2012, when Mother was 20 years old and Father was 29. Mother became pregnant soon after the relationship began. She moved into Father's apartment in November 2012. Mother gave

birth to the parties' son, Noah, in May 2013. Father signed a voluntary acknowledgment of paternity and is listed as the child's father on the birth certificate.

Mother and Father had a volatile relationship. Both parties accuse the other of physical violence but deny being physically violent themselves. The police were called to the parties' apartment on numerous occasions. After a particularly heated argument in August 2013, Father moved out of the apartment and into his parents' home. Noah was about three months old at the time. Father filed a petition for custody and visitation on August 29, 2013, in the Juvenile Court of Shelby County. Father sought to be named primary residential parent but, in the alternative, requested joint and equal parenting time for the parties. Mother filed a response and counter-petition, asking the court to limit Father to supervised "non-overnight" visitation due to his history of alcohol abuse and also due to Mother's claims of domestic violence during the parties' relationship.

The matter was heard on or about February 5, 2014, by Juvenile Court Magistrate Harold W. Horne. After the hearing, Magistrate Horne entered written findings recommending that Mother and Father have "joint custody" of Noah, with Mother being named primary residential parent in even years and Father being named primary residential parent in odd years. During the years when either parent was designated as alternate residential parent, he or she would have parenting time with Noah during the first, third, and fifth weekends of each month, on certain holidays, and for two fifteen-day periods during the summer. The designation of primary residential parent was to change each year on August 1. Mother was designated primary residential parent as of the date of the order. Magistrate Horne recommended that each party be responsible for his or her own attorney's fees. These findings and recommendations were confirmed and entered by the Juvenile Court Judge as an order of the Juvenile Court on or about February 24, 2014.

Mother timely filed a request for rehearing before the Juvenile Court Judge.[1] The Juvenile Court Judge appointed another Juvenile Court Magistrate, Dan H. Michael, to rehear the matter as "substitute judge" and "special judge" pursuant to Tennessee Code Annotated section 17-2-122(b). The rehearing occurred on June 26, 2014. By that time, the parties had been operating under Magistrate Horne's parenting schedule for over four months, with Mother having primary residential parenting responsibilities and Father having parenting time every other weekend and for one extended period during early June.

Father was 31 at the time of the rehearing in June 2014. Father owned his own business and also worked two part-time jobs. Father was residing with his parents but

---

[1]Tennessee Code Annotated section 37-1-107(e) and Tennessee Rule of Juvenile Procedure 4(c)(1) permit any party to request a rehearing before a juvenile court judge of certain matters heard by a magistrate.

continued to pay the rent for the apartment where Mother lived with Noah, in addition to the utilities for the apartment and the cost of Noah's health insurance. He also gave Mother additional cash for Noah's support. Noah was thirteen months old at the time of the rehearing.

Father admitted that he had a long history of alcohol abuse during his 20s. He pled guilty to five DUI charges between 2003 and 2009 and pled guilty to domestic assault in 2010. Father testified that he hit "rock bottom" when he was incarcerated in January 2010, and, upon his release, he began a year-long drug court program that included drug and alcohol testing, intensive outpatient rehabilitation, participation in alcohol and drug treatment groups, and Alcoholics Anonymous meetings. Father completed the drug court program in May 2011. It was not until June 2012 that Father began his relationship with Mother, and Noah was born in May 2013. At the June 2014 rehearing, Father testified that he occasionally consumes alcohol in connection with his work in the restaurant business. However, he claimed that he had not been intoxicated since completing the drug court program three years earlier, in 2011. Father's employer for two years testified that Father was a "model employee" as a restaurant manager. He testified that Father had never failed a drug screen and that he had never seen Father intoxicated, even when vendors brought alcohol to the restaurant for sampling.

Father testified that Mother was using his history of alcohol abuse to "label" him as a drunk when that was absolutely no longer the case. He noted that his vehicle was equipped with an ignition interlock device that does not allow him to start the vehicle if he has consumed alcohol. He voluntarily kept the apparatus on his vehicle even after the restriction on his driver's license was lifted. He claimed that he did so in order to provide "rigid evidence" that he is no longer drinking. Father testified that Mother became belligerent at two visitation exchanges (after he filed his petition for custody) and accused him of being drunk at the exchanges. After the second incident, Father went directly to a police station and requested a Breathalyzer test. The officer was unable to administer the test under such circumstances but did testify at the rehearing that Father did not appear to be intoxicated or impaired. While the custody litigation was pending, Father voluntarily submitted to routine alcohol and drug testing at a local screening facility and passed two hair follicle drug screens and nineteen alcohol screens. Each drug screen was capable of detecting the presence of substances for the past 90 days, and each alcohol screen covered a three to four day period. Father also completed a ten-week program of parenting classes at the Exchange Club. In sum, Father claimed that he was "absolutely reformed from what [he] used to be" so that he could have shared custody of his son. Father's parents also testified that Father had become a sober man and a "recovered" alcoholic. Father's mother testified that Mother had lied to them in the past

by accusing Father of drinking when he was not.[2]  Father testified that Mother was physically abusive during the parties' relationship, and his father testified that he had witnessed Mother hitting Father with her fists during an argument.

Mother testified that Father was lying about not being intoxicated since he completed the drug court program in May 2011.  She testified that Father routinely came home visibly drunk when they lived together.  Two of Mother's friends from high school testified that they saw Father drinking heavily and doing drugs at the Bonnaroo Music Festival in the summer of 2012, which was before Father began dating Mother, but after his completion of the drug court program.  (Mother admitted that she also drank and did drugs at Bonnaroo.)  Another witness, who previously dated Father's brother, testified that she had seen Father drinking "a few beers" on four different occasions in 2012 or early 2013, before Noah's birth.

Mother testified that Father's drinking problem "may have been a little less" after Noah was born, but she said "it was definitely still an issue."  She admitted Father had never harmed Noah but said Father did leave Noah crying in his swing on two occasions when Father was drinking.  One of Mother's friends testified that she saw Father drunk at the apartment he shared with Mother on July 4, 2013, after Noah's birth.  Mother testified that she accused Father of drinking at the visitation exchange because she could smell alcohol "coming out of his pores" as if he was hungover.  She testified that Father knows how to "cheat" drug and alcohol screens by using a urine sample from another person, because he had provided clean samples for co-workers in the past.

Regarding the allegation of domestic violence, Mother testified that Father slapped her about five times during the parties' relationship, and that he also pinned her against a door during an argument.  However, Mother admitted to throwing a chair leg and putting a hole in the door of their apartment.

Additional witnesses testified as well, but it is not necessary to recount their testimony for purposes of this opinion.  The magistrate sitting as special judge entered an order granting "custody" to Mother and providing that Father would have only supervised visitation.  Father was ordered to pay all of Mother's attorney's fees, which totaled $35,640.49.  Father timely filed a notice of appeal.

## II. ISSUES PRESENTED

Father raises the following issues on appeal:

---

[2]Mother admitted that she lied about Noah's paternity by telling an ex-boyfriend that he was the father "trying to get back at him."

1. Did the trial court err in granting full custody to Mother;

2. Did the trial court err in ordering only supervised visitation for Father;

3. Did the trial court err by failing to make specific findings of fact; and

4. Did the trial court err in awarding Mother attorney's fees.

For the following reasons, we vacate the decision of the juvenile court and remand for further proceedings.

### III. STANDARD OF REVIEW

Appellate courts review a trial court's decision on a parenting arrangement for abuse of discretion, keeping the following principles in mind:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court ... appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88.

*Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013). The abuse of discretion standard "does not permit an appellate court to substitute its judgment for that of the trial court, but 'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives[.]'" *Gonsewski*, 350 S.W.3d at 105 (quoting *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010)).

## IV. DISCUSSION

We begin with Father's argument that the trial court erred by failing to make specific findings of fact to support its decision. After reciting the procedural history of the case, the juvenile court's order simply stated, "upon proof introduced and the entire record, the Special Judge finds that the Petition for Custody and Visitation filed in this Court on August 29, 2013 should be sustained." The order provided that Mother was awarded "custody" of the child and that Father would have "supervised visitation privileges" on the first, third, and fifth weekends of the month in addition to certain holidays and summer visitation.[3] The order did not reference any factors that guided the court's decision, and the court did not make any written findings. The court's order awarding attorney's fees simply stated that the award was based on "the entire record in the cause, and all of the factors set forth in Rule 1.5 of the Rules of Professional Conduct as set forth in Rule 8 of the Rules of the Supreme Court of the State of Tennessee."

"In bench trials, trial courts must make findings of fact and conclusions of law to support their rulings." *Hardin v. Hardin*, No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at *3 (Tenn. Ct. App. Dec. 27, 2012). Tennessee Rule of Civil Procedure 52.01 states, in pertinent part:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.[4]

---

[3]The order provided that the parties had "permission to change this visitation order without the participation of the Court" if both parents agreed and the revised schedule was put in writing and signed by both parents.

[4]Rule 1(b) of the Rules of Juvenile Procedure provides that:

> The Tennessee Rules of Civil Procedure shall govern all cases involving the termination of parental rights, paternity cases, guardianship and mental health commitment cases

"Simply stating the trial court's decision, without more, does not fulfill this mandate." *Barnes v. Barnes*, No. M2011-01824-COA-R3-CV, 2012 WL 5266382, at *8 (Tenn. Ct. App. Oct. 24, 2012).

We have held that "the General Assembly's decision to require findings of fact and conclusions of law is 'not a mere technicality.'" *Hardin*, 2012 WL 6727533, at *3 (quoting *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009)). Findings and conclusions serve the important purposes of facilitating appellate review and promoting the just and speedy resolution of appeals. *Id.* Without sufficient findings and conclusions, "'this court is left to wonder on what basis the court reached its ultimate decision.'" *Id.* (quoting *In re K.H.*, 2009 WL 1362314, at *8).

> There is no bright-line test by which to assess the sufficiency of factual findings, but "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue."

*Lovlace v. Copley*, 418 S.W.3d 1, 35 (Tenn. 2013) (quoting 9C *Federal Practice & Procedure* § 2579, at 328).

Our task on appeal in this case is to determine whether the trial court abused its discretion in fashioning this particular parenting arrangement. Again, "[a]n abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski*, 350 S.W.3d at 105 (citing *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson*, 318 S.W.3d at 335). Unfortunately, we cannot determine whether the trial court applied an incorrect legal standard or relied on reasoning that caused an injustice because we do not know what legal standard the court applied, or what reasoning it employed. *See Halliday v. Halliday*, No. M2011-01892-COA-R3-CV, 2012 WL 7170479, at *12 (Tenn. Ct. App. Dec. 6, 2012), *perm. app. denied* (Tenn. Apr. 11, 2013) (explaining that "this Court cannot determine whether the trial court abused its discretion" in the absence of factual findings by the trial court); *see also In re Connor*

---

involving children, and child custody proceedings under T.C.A. §§ 36–6–101, et seq., 36–6–201, et seq., and 37–1–104(a)(2) and (f)[.]

Because custody is at issue in this case, the Rules of Civil Procedure govern the proceedings in the Juvenile Court.

*S.L.*, No. W2012-00587-COA-R3-JV, 2012 WL 5462839, at *4 (Tenn. Ct. App. Nov. 8, 2012) ("findings of fact are particularly important in cases involving the custody and parenting schedule of children," and without such findings "we are unable to afford appropriate deference to the trial court's decision"). "'Discretionary choices are not left to a court's inclination, but to its judgment; and its judgment is to be guided by sound legal principles.'" *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting Martha S. Davis, *Standards of Review: Judicial Review of Discretionary Decisionmaking*, 2 J. App. Prac. & Process 47, 58 (2000)). Thus, an abuse of discretion will be found "when the trial court . . . fails to properly consider the factors on that issue given by the higher courts to guide the discretionary determination." *Id.*

We recognize that, at the conclusion of the testimony, the magistrate sitting as substitute judge addressed Father and told him that he did not find his testimony credible. He said, "You may be a dry drunk, but you're not sober." Nevertheless, the magistrate's oral comments about Father's sobriety are no substitute for specific written factual findings and conclusions of law to justify the court's parenting arrangement and to comply with the mandates of Rule 52.01. It is well settled that a trial court "speaks through its order, not through the transcript." *In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001).

"One remedy appellate courts typically apply when a trial court's factual findings fail to satisfy the Rule 52.01 requirement is to remand the case to the trial court with directions to issue sufficient findings and conclusions." *Lovlace*, 418 S.W.3d at 36. In the case before us, Mother asks this Court to independently review the record and determine whether the trial court's parenting arrangement is appropriate, rather than remanding the case, in order to save the parties time and money. We decline to do so in this case. "The importance of Rule 52.01 findings of fact and conclusions of law cannot be underscored enough, particularly in a fact-intensive matter such as a case in which the parenting arrangement is at issue." *Williams v. Singler*, No. W2012-01253-COA-R3-JV, 2013 WL 3927934, at *9 (Tenn. Ct. App. July 31, 2013). As noted above, trial judges "are better positioned to evaluate the facts" in cases involving parenting arrangements, which "are factually driven and require careful consideration of numerous factors." *Armbrister*, 414 S.W.3d at 693. A decision regarding a parenting arrangement "often hinges on subtle factors such as the [parties'] demeanor and credibility during the trial proceedings." *Battleson v. Battleson*, 223 S.W.3d 278, 282 (Tenn. Ct. App. 2006). Unlike appellate judges, trial judges have the opportunity to observe the witnesses and make credibility determinations. *Armbrister*, 414 S.W.3d at 693 (citing *Massey–Holt*, 255 S.W.3d at 607). Accordingly, "determining the details of parenting plans is peculiarly within the broad discretion of the trial judge." *Id.* (citation omitted). The facts of this case are hotly disputed, and credibility is likely to weigh heavily on any decision

on an appropriate parenting plan. Resolving these issues is a task for the trial court.[5] *See Kathryne B.F. v. Michael B.*, No. W2013-01757-COA-R3-CV, 2014 WL 992110, at \*7 (Tenn. Ct. App. Mar. 13, 2014) ("The determination of custody of a child is a very fact specific inquiry, and that inquiry is within the purview of the trial court, not the appellate court.").

The trial court's order does not indicate how or why it reached its decision on this particular parenting arrangement or this award of attorney's fees. Because the trial court did not make any findings to explain its decision, we cannot discern whether the trial court abused its discretion with regard to these issues. We therefore vacate the trial court's order and remand for entry of an order addressing these issues in compliance with Rule 52.01. *See Kathryne B.F.*, 2014 WL 992110, at \*8 (remanding for specific findings concerning the trial court's decision on attorney's fees); *In re Connor S.L.*, 2012 WL 5462839, at \*4 (remanding for factual findings to justify a particular parenting schedule); *Cf. Spigner v. Spigner*, No. E2013-02696-COA-R3-CV, 2014 WL 6882280, at \*10 (Tenn. Ct. App. Dec. 8, 2014) (concluding that the trial court's failure to articulate any factors considered in its decision with regard to a parenting plan required this Court to vacate the decision and remand for the entry of an order that specifically addressed the best interest of the child and articulated the factors relied on by the trial court in reaching its decision).

This opinion should not be construed as preventing the parties from putting on additional evidence regarding the child custody issue on remand, including how the parties' circumstances have changed since the entry of the July 30, 2014 order.

> [W]hen a trial court is directed to reconsider an issue on remand that involves the circumstances of children and their parents, 'the trial court should endeavor to ascertain and give effect to the parties' actual circumstances, which will necessarily change over the course of time, e.g., people remarry, have more children, [etc.].

*Kathryne B.F.*, 2014 WL 992110, at \*7 (quoting *In re C.W.*, 420 S .W.3d 13, 22 (Tenn. Ct. App. 2013)); *see also Spigner*, 2014 WL 6882280, at \*12. In light of the passage of time and the nature of this case, the trial court may, in its discretion, consider additional evidence to ensure that any custody order is based on the parties' actual circumstances. *Kathryne B.F.*, 2014 WL 992110, at \*7. We recognize that "'[e]vents and lives have not stood still while this custody dispute has been in the courts.'" *Barnes*, 2012 WL

---

[5]In order to save time and money, parties who receive an order that fails to comply with Rule 52.01 have the option of seeking correction of that deficiency in the trial court by filing a motion under Rule 52.02 "to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted." Tenn. R. Civ. P. 59.01.

5266382, at *9 (quoting *Wall v. Wall*, No. W2010-01069-COA-R3-CV, 2011 WL 2732269, at *26 ( Tenn. Ct. App. July 14, 2011)).

Pending entry of the trial court's order on remand, we reinstate the provisions of the February 24, 2014 order entered by Magistrate Horne and approved by the juvenile court judge. Specifically, Mother and Father shall have joint custody of Noah, with the designation of primary residential parent alternating each year on August 1. Mother shall be designated primary residential parent upon entry of this opinion, and Father shall have residential parenting time as set forth in the February 24, 2014 order. The juvenile court's award of attorney's fees is likewise vacated.

## V. CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is hereby vacated and remanded for further proceedings. Costs of this appeal are taxed one-half to the appellee, Emily W., and one-half to the appellant, William J., and his surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE